IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                         Case No. 6:15-cr-10080-JTM

MARIO ALBERTO HERNANDEZ-ESQUIVEL,

       Defendant.

MEMORANDUM AND ORDER

Defendant Mario Alberto Hernandez-Esquivel is charged with one count of unlawful re-entry into the United States following deportation, in violation of 8 U.S.C. § 1326(a) and (b). Dkt. 7. The matter came before the court on November 6, 2015, for a hearing on defendant's motion to suppress evidence. Dkt. 12. The court orally denied the motion at the conclusion of the hearing. This written memorandum will supplement the court's oral ruling.

I. **Facts**.

The court finds the following facts from the evidence presented at the hearing. Homeland Security (ICE) Deportation Officer Douglas Thompson received information that a certain alien (not the defendant) who had recently been released from the Sedgwick County jail was living at 4005 E. Roseberry in Wichita, Kansas. Thompson and fellow Deportation Officers Steve Scrivner and Rod Smith went to that address on June 4, 2015, at 7:30 a.m. in search of the alien. All three officers were wearing vests or

other clothing that identified themselves as law enforcement officers and they carried visible firearms on their belts.

Officer Thompson approached and knocked on the front door of 4005 E. Roseberry. The residence was part of a duplex. Scrivner stayed back a short distance from Thompson while Smith went around to the side of the duplex. No one answered Thompson's knock at the door. While Thompson was still standing by the front door, a man came out of the other front door of the duplex (4009 E. Roseberry) to take out some trash. The man – defendant Mario Alberto Hernandez-Esquivel – took the trash to the curb. He was wearing only a pair of shorts and flip-flops.

Officer Scrivner waved his hand to get defendant's attention and said, "Hey, police, can we talk to you for a minute?" Scrivner moved a short distance toward defendant and defendant moved toward Scrivner. Scrivner said they were looking for the guy who lives next door and asked if defendant would mind looking at a photograph of him. Scrivner called to Thompson, who had the file on the alien they were seeking, to show defendant a picture of the man. Thompson joined them in the front yard and showed defendant the picture. At some point early on, the officers began talking to defendant in Spanish, because defendant had obvious difficulty speaking English and both officers were fluent in Spanish. Defendant said he knew the neighbor and that he had had a couple of beers with him before. He said he hadn't seen him in a couple of days.

Scrivner and Thompson had noticed defendant's tattoos, which included Aztec symbols and Spanish-language phrases. His lack of English ability, heavy Spanish

2

accent and tattoos indicated to Scrivner that he was likely from Mexico. Either Scrivner or Thompson proceeded to ask defendant where he was from. Defendant said Mexico. They asked if he had identification; he said no. One of the officers asked if he was in the country legally or illegally; defendant said illegally. They asked if he had been deported before. He said that he had. They asked if he had ever been arrested. He hesitated before saying that he had been arrested in Georgia. (All of this conversation was in Spanish). At that point, Thompson directed defendant to put his finger on a mobile scanning "EDDIE" device. Defendant did so. The scanner, which was linked to an ICE database via Thompson's phone, soon verified that defendant had been previously deported.  The agents arrested defendant at that point.

## II. Discussion

Defendant's motion argues that the officers detained him without reasonable suspicion by "summoning" him over to them, by asking about his identification and citizenship status, and by requiring him to submit to a fingerprint scan. Dkt. 12 at 2.

The Fourth Amendment protects the right of people to be secure from unreasonable searches and seizures. *U.S. Const.  Amend. IV*. In analyzing whether a particular encounter between an individual and a police officer amounts to a "seizure," courts look to the Supreme Court's framework for identifying three types of encounters: (1) consensual encounters, which do not implicate the Fourth Amendment; (2) investigative detentions, which are seizures of limited duration that must be supported by a reasonable suspicion of criminal activity; and (3) arrests, which are intrusive seizures that must be supported by probable cause. *See United States v. Brown*, 496 F.3d

1070, 1074 (10th Cir. 2007).   These categories are not static and an encounter may escalate from one level to another. *See United States v. White*, 584 F.3d 935, 945 (10th Cir. 2009) (citation omitted).

A consensual encounter occurs when an officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer, to leave or to otherwise end the encounter. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required. Only when an officer, by means of physical force or a show of authority, has in some way restrained the liberty of a person may the court conclude that a seizure has occurred within the meaning of the Fourth Amendment. *See California v. Hodari D.*, 499 U.S. 621, 628 (1991); *Terry v. Ohio*, 392 U.S. 1, 19 (1968).

Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, or by putting questions to him if the person is willing to listen. *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  Even when officers have no basis for suspecting an individual, they may generally ask questions of him – including asking such things as to see his identification or to search his luggage – so long as they do not convey the impression that compliance with their requests is required. *Id.* "[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do

so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984).

By contrast, an investigative detention occurs when an officer, by means of use of force or a show of authority, briefly detains an individual to determine his identity or maintain the status quo while obtaining more information. Examples of circumstances that might indicate a seizure (even where the person does not attempt to leave) would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, or the use of language, gestures or a tone of voice indicating that compliance with the officer's request might be compelled. *See United States v. Rogers*, 556 F.3d 1130, 1137-38 (10th Cir. 2009).   In *Florida v. Royer*, 460 U.S. 491 (1983), for example, agents at an airport asked to see a passenger's ticket and driver's license, which the man produced. The Supreme Court found that asking to see the man's documents was "no doubt permissible," but that agents effectively seized the man when they told him they suspected him of drug trafficking and, while still holding his ticket and driver's license, asked him to accompany them to a nearby interrogation room.

Under the totality of the circumstances, the court concludes that a reasonable person in Mr. Hernandez's position would have felt free to decline the officers' request to talk and would have felt free to decline to answer questions or to end the encounter. The officers used no show of authority to suggest to defendant that his cooperation was required. Officer Scrivner began the encounter by identifying himself as a law enforcement officer (a fact that would have been obvious to defendant) and asking

defendant if they could ask him some questions. *Cf. Royer*, 460 U.S. at 497 ("Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification."). Defendant indicated his willingness to do so, both by coming to speak to the officers and by answering their questions. The evidence shows the officers were polite throughout and did not use language, gestures or a tone of voice indicating that compliance with their inquiries was compelled. Although three officers were present on the scene, which could have been somewhat intimidating, one of the officers (Smith) took no part in the discussion with defendant and the other two used no physical, verbal or other means of coercion to suggest to defendant that he had to stay and talk with them. The officers never brandished a weapon or threatened defendant in any way. They did not touch him. The questions took place out in the open, near the front of defendant's residence. And although the officers did not tell defendant that he was free to go, neither did they do anything to suggest that he could not end the encounter or go back inside his house if that was what he wanted to do.

The fact that the officers proceeded to ask defendant about his identity, citizenship, and whether he was in the U.S. legally or illegally – even though potentially incriminating – did not convert the consensual encounter into a detention. *Cf. Bostick*, 501 U.S. at 439 (officers do not violate the Fourth Amendment merely by putting questions to a person who is willing to talk). The law is clear that officers may approach and ask questions or request to see a person's identity even in the absence of any reasonable suspicion of criminal activity.  The fact that most people would respond to

such inquiries – and the fact that defendant did so here -- "hardly eliminates the consensual nature of the response." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984).  And while the Tenth Circuit has indicated that "accusatory, persistent, and intrusive questioning can turn an otherwise voluntary encounter into a coercive one," nothing like that occurred here. *Cf. United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995). The evidence here shows a brief voluntary encounter in which officers politely asked defendant about his status and defendant chose to answer the officers' questions. *Bostick*, 501 U.S. at 434 ("Since *Terry*, we have held repeatedly that mere police questioning does not constitute a seizure."); *United States v. Ringold*, 335 F.3d 1168, 1173 (10th Cir. 2003) ("the mere fact that officers *ask* incriminating questions is not relevant to the totality-of-the-circumstances inquiry – what matters instead is 'the manner' in which such questions were posed.") (emphasis in original).

It bears noting that the officers had reason to believe almost from the outset that defendant was likely from Mexico. He had tattoos with Spanish phrases and Aztec themes, and he spoke very little English but was fluent in Spanish. And once defendant admitted to the officers that he was from Mexico, that he had previously been deported, *and that he was in the country illegally*, the officers had probable cause to believe that he had violated 8 U.S.C. §1326(a). *Cf. United States v. Argueta-Mejia*, 615 Fed.Appx. 485, 2015 WL 3895213 (10th Cir. 2015) (probable cause might be lacking where officer had no information about whether defendant had permission to reenter the U.S.). The officers thus had probable cause to arrest defendant by the time Officer Thompson directed

defendant to place his finger on the mobile scanner. The fact that the officers required him to submit to the scan at that point was not an unreasonable search or seizure.

Defendant argues that *United States v. Olivares-Rangel*, 458 F.3d 1104 (10th Cir. 2006) controls this case. Dkt. 12 at 8. But in *Olivares* the Government conceded that the initial stop and arrest of the defendant had been unlawful. *Olivares*, 458 F.3d at 1107. The only issue in that case was whether the defendant's identity could be suppressed as a result of the unlawful seizure. In the instant case there was no seizure initially, and the use of the scanner occurred only after the officers had probable cause to believe defendant had committed an offense.

**IT IS THEREFORE ORDERED** this 18th day of November, 2015, that defendant's motion to suppress evidence (Dkt. 12) is DENIED.

_____s/ J. Thomas Marten__
J. THOMAS MARTEN, JUDGE